### Petition of AGUSTIN.
### No. 8255–M.

District Court, N. D. California, S. D.

Oct. 10, 1945.

Daniel H. Lyons, Naturalization Examiner, of San Francisco, Cal., for the Government.

Gus C. Ringole, of San Francisco, Cal., amicus curiae, by special appointment of the Court.

GOODMAN, District Judge.

Petitioner, a native of the Philippines, has applied for naturalization under the provisions of Section 701 of the Nationality Act of 1940 as amended, 50 U.S.C.A. Appendix, § 640. The naturalization service, in submitting the petition, advises the court that it has no objection to the granting of the same, but makes no recommendation, one way or the other.

The statute, i.e. Section 701 (adopted March 27, 1942), authorizes the naturalization of "any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and who, having been lawfully admitted to the United States, including its Territories and possessions, shall have been at the time of his enlistment or induction a resident thereof, * * *" without the formalities and conditions required of civilian aliens. Proof of military or naval service may be made either "by a duly authenticated copy of the record of the executive department having custody of the record of petitioner's service, showing that the petitioner is or was during the present war a member serving honorably in such armed forces" or by "affidavits, forming part of the petition, of at least two citizens of the United States, members or former members during the present war of the military or naval forces of the noncommissioned or warrant officer grade or higher. * * *". No authenticated copy of the record of the executive department was

furnished in this case but the alternative method of proof was followed, namely, there was attached to and a part of the petition, the affidavits of Major Alfred W. Ludtke of Fort Mason, California, and Lt. Col. Harry Hewitt of the Presidio Military Reservation, San Francisco, California, each of whom stated under oath as follows: "I am a citizen of the United States of America; I personally know the petitioner named in this petition for naturalization to be a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States, and that he is now serving honorably, in the military or naval forces of the United States, as Col. in U. S. Army under Serial No. O—4000, as shown by official service records." Such proof should under the provisions of the statute prima facie suffice to admit petitioner to citizenship. Indeed, the jurisdiction of the court to go back of the affidavits of the witnesses might well be questioned, in view of the recent decision of the Circuit Court of Appeals of this Circuit in Fong Chew Chung v. United States, 9 Cir., 149 F.2d 904. In that case, District Judge St. Sure, notwithstanding presentation of a certificate of discharge ·by Fong Chew Chung, certifying to his honorable service in the army, had, after examining into all the circumstances, determined that in fact the petitioner had not rendered the service prescribed by the statute as a prerequisite to the granting of citizenship. The Circuit Court, in reversing Judge St. Sure's decision, held that the District Court "was without the jurisdiction to go back of the discharge order upon the subject of petitioner's service while he was in the army." Fong Chew Chung v. United States, supra, 149 F.2d at page 906.

However at the hearing upon the instant petition, the naturalization service presented, in considerable detail, evidence concerning the nature of petitioner's alleged military service. It appears therefrom that petitioner was born on November 17, 1907, in Sara, Iloilo, P. I. On December 6, 1941, he was by occupation a mechanic, then residing in Manila, P. I. On December 7, 1941, after the Japanese attack upon the Philippines, petitioner offered his services to the United States Army. As a civilian he was engaged by the Army to convoy troops from Manila to Bataan. He continued in that work until December 30, 1941, at which time the bridge which connected Bataan and Manila was destroyed by enemy action. Thereafter Captain Dillon of the U. S. Army, under whose orders petitioner had been engaged in the convoy work, asked for volunteers to seek out mountain trails by which troops could be infiltrated to Bataan and petitioner volunteered for this service. When petitioner reached the combat zone, his companion, one Lt. Vidin, was captured by the Japanese. Thereupon petitioner attempted to return to Manila, but was himself captured by the Japanese. He remained a captive for several days and succeeded in escaping to the Sierra Madre Mountains of Rizal Province. There he began the organization of a guerrilla group, which started with himself and two others and grew to twenty in number within a month. By April of 1942, under petitioner's leadership, the guerrilla band had increased to approximately seventy in number. During March, 1942, petitioner gave refuge to three army officers of the 91st Division of the U. S. Army, one of whom was one Lt. Russell Barrows. These officers remained at petitioner's camp for about a month. Just prior to their departure, Lt. Barrows administered the oath of allegiance to the United States to petitioner reading it out of the Articles of War. Petitioner in turn administered the oath to his men. Thereafter petitioner devoted himself to the leadership of his band of guerrillas, harassing the enemy and sabotaging their installations. Extreme hardships were suffered in the process. Finally in the Fall of 1944, by which time petitioner's guerrilla group had increased to one thousand active members, contact was made, by radio, with General McArthur's headquarters in Australia. Thereafter by means of submarines, supplies and equipment were delivered to petitioner from General McArthur's headquarters. A Captain George Miller and Captain Brookstellar arrived at petitioner's headquarters and acted as liaison officers between McArthur's headquarters and petitioner's troops. After the landing of General McArthur's forces on Leyte Island, petitioner was directed by General McArthur to take orders from General Kruger, commanding officer of the 6th Army Corps, U. S. Army and thereafter orders were transmitted by radio from General Kruger's headquarters to petitioner. After the landing of American forces upon Luzon, and on or about March 2, 1945, petitioner

received orders from General Kruger to bring his men down from the hills to report to the nearest U. S. troops. This was done and petitioner reported to the commanding officer of the 43rd infantry division, Mayor General Wing. From and after March 13, 1945, petitioner's guerrilla group, which was known as Yay regiment, Marking's "Fil Americans" became a part of the 43rd Division. This status was officially recognized by an order issued by headquarters of the Sixth Army, on May 16, 1945, under the signature of Capt. W. W. Stuart, Assistant Chief of Staff of the 6th Army, wherein it was stated.

"The following guerrilla units are recognized by the Commander in Chief, Southwest Pacific area, as authorized elements of the United States Army Forces in the Far East, effective as of the date specified after each unit listed: * * * Yay Regiment, Marking's Fil-Americans 13 Mar. 45."

Further recognition of his status was given petitioner in the form of a document signed by Maj. General Leonard Wing, Commanding General of the 43rd Division, by Brig. General A. N. Stark, its executive officer, by Col. Joseph P. Cleland, Regimental Commander, and, by Lt. Col. Lloyd E. Barron, Commander of the First Battalion of said regiment, certifying that: "Marcos V. Agustin, Col. Infantry, (Marking), Commanding officer of 'Marking's Guerrillas,' is now personally commanding the 'Yay' Regiment, his crack combat unit now attached to the 43rd Division, U. S. Army" and allowing him and his bodyguards access to and from Manila.

Previously, in October of 1944, the President of the Philippines, by executive order, for the purpose of giving official status to the guerrilla fighters, had declared all such persons to be on active service in the Philippine Army and further fixed the annual pay and quarters' allowances of the officers according to the same schedule prevailing in the U. S. Army.[1]

In May of 1945, petitioner led his regiment in an attack on Ipo dam for the purpose of securing the water supply of Manila. On that mission he performed feats of valor which resulted in the bestowal upon him by the Commanding General of

the 11th Corps, upon the recommendation of Brig. Gen. Alex. N. Stark, of the distinguished service cross. The citation, which accompanied the award, in recounting Col. Agustin's feats while leading his men through concentrated artillery, mortar, machine-gun, and sniper fire to take a strategic hill, the possession of which was necessary to the success of the operation, refers to his extraordinary heroism and courageous personal leadership. After attachment to the 43rd Division pursuant to the order of May 16, 1945, petitioner was paid the salary and allowances of a colonel in the U. S. Army from funds furnished by the finance officer of the 6th infantry division attached to the 6th Army. On July 10, 1945, by an order signed by Lt. Col. J. H. Lowell, assist. Adj. General, attached to General McArthur's headquarters, petitioner was granted leave to come to the United States, furnished transportation and directed upon termination of his leave to return to his proper overseas station; and the transportation corps of the army was directed to furnish the necessary transportation for petitioner.

All in all, the record discloses a brilliant saga of heroism, hardship and loyalty on the part of Col. Agustin in years of fighting against the enemies of the United States.

The question for decision is: Has the petitioner served *in the military forces of the United States during the present war,* so as to qualify him for American citizenship?

■ If formal enlistment[2] or induction is intended by the statute to be a prerequisite for the bestowal of citizenship under Section 701 of the Nationality Act, it would appear that petitioner is not qualified for citizenship.

While the statute employs the words "enlistment" and "induction," neither enlistment nor induction is declared by the statute to be a condition precedent to the bestowal of citizenship. *Service in the military or naval forces of the United States during the present war* is the designated statutory prerequisite. The words "enlistment or induction" were used in the statute obviously in connection with the

---

[1] This order is specifically referred to in the order of May 16, 1945, issued by U. S. 6th Army headquarters, supra.

[2] For an analysis of the distinction between voluntary enlistment and induction under the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq., and the legal consequences thereof, see Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917.

requirement that the petitioner shall have been a resident of the United States, its territories and possessions, at the time of commencement of service. In my opinion these words are intended to do no more than fix in point of time the period of commencement of service.

It is clear from an examination of the Congressional proceedings at the time Section 701 was adopted, that Congress did not intend to establish any formalistic technicalities as a condition precedent to the bestowal of citizenship upon aliens serving in our armed forces. I stated in the Petition of Delgado, D.C., 57 F.Supp. 460, at page 462—

"It was clearly the intent of Congress in adopting §' 701 to follow the historic course of granting the boon of citizenship to loyal aliens engaging to help defend this country. The House Committee reporting H. R. 1710 (which became § 701) said: 'It is a matter of historic record that the Government of the United States, as an encouragement to loyal aliens engaged in the defense of this country through service in the armed forces, has in past years, relieved them from some of the burdensome requirements of the general naturalization laws.' House Misc.Rep. 10661, page 3. And again in the same report, it is stated: 'This proposed legislation proceeds upon the principle that non-citizens who are ready and willing to sacrifice their lives in the maintenance of this democratic government are deserving of the high gift of United States citizenship when vouched for by responsible witnesses as loyal and of good character and shown by government records as serving honorably.' "

Certainly petitioner here was within the category of those "who are ready and willing to sacrifice their lives in the maintenance of this democratic government. * * *" The broad and liberal concept, upon which Congress based the bestowal of citizenship upon aliens defending this country, must therefore, in my opinion, be the background against which the court should appraise the nature of petitioner's military activities in determining the question as to whether he served in the military forces of the United States. Extreme technical distinctions should not be invoked to defeat the application for citizenship of a worthy and distinguished Filipino as against a fair and liberal interpretation of Congressional intent.

Petitioner did, in the early period of his guerrilla activities, take the oath of allegiance to the United States administered to him by a regular United States Army officer. He in turn administered the same oath to the men under his command.

■ "Mere informalities in the enlistment proceedings will not invalidate the enlistment." 6 C.J.S., Army and Navy, § 21, p. 392; In re Stevens, U.S., 24 Law Rep. O.S., 205.

In 1890, in the case of In re Grimley, 137 U.S. 147, at page 153, 11 S.Ct. 54, 55, 34 L.Ed. 636, Mr. Justice Brewer, speaking of the status resulting from enlistment in the army, said: "* * * unless there be in the nature of things some inherent vice in the existence of the relation, *or natural wrong in the manner in which it was established,* public policy requires that it should not be disturbed" (emphasis supplied). In the same case, the oath of allegiance is referred to as the "pivotal fact" in enlistment.

■ That the evidence as to the taking of the oath of allegiance rests in parol is not important. Parol evidence is admissible to establish the fact of enlistment. 6 C.J.S., Army and Navy, § 21, p. 392. Town of Lebanon v. Heath, 47 N.H. 353.

In the recent case of Mayborn v. Heflebower, 5 Cir., 145 F.2d 864, at page 866, the court in determining the validity of a selectee's induction under the Selective Training and Service Act said: "* * * whether or not all formalities prerequisite to induction were observed, the subsequent conduct of the parties was such that the irregularities were cured or the right to invoke them was waived. It is manifest that the induction officers regarded appellant as a soldier at all times after the induction ceremony was completed, and appellant voluntarily accepted the benefits and *assumed the obligations* incident to membership in the armed forces." (Emphasis supplied.)

After several years of heroic service against the Japanese, the regiment which petitioner commanded, as well as petitioner, were, as before stated, recognized as authorized elements of the United States forces in the Far East.

Apparently the authority of the 6th Army headquarters to include petitioner's regiment as part of our armed forces stems from War Department Circular #

220 of date July 7, 1942, which reads as follows:

"II. Appointment or enlistment in Army of the United States of officers and enlisted men in Philippine Army.

"1. That appointment or enlistment in the Army of the United States of those officers and enlisted men of the Philippine Army who are serving with the United States armed forces is authorized.

"2. Appointments or enlistments will be made in grades commensurate with the grades held in the Philippine Army at time of transfer. (A.G. 210.1) (6–10–42) (By order of the Secretary of War, G. C. Marshall, Chief of Staff.)"[3]

After March 1945, petitioner was paid the compensation of a colonel out of funds furnished by the Finance officer attached to the 6th Army. High ranking officers of the 6th Army certified to his attachment to the United States Army by furnishing him with an appropriate certificate and pass. Orders respecting his leave to come to the United States, his method of transportation, and directions as to the time and place of his return, were officially issued by United States Army headquarters.

Thus, in addition to his physical acts of service in the United States Army and as a part thereof, we have official documentation of his status by proper army officers.

The final and most impressive act in the series of events constituting official recognition of petitioner's status is the award of the Distinguished Service Cross to petitioner. 10 U.S.C.A. § 1406 authorizes the President "to present * * * a distinguished-service cross of appropriate design and a ribbon, together with a rosette or other device, to be worn in lieu thereof, to any person who, *while serving in any capacity with the Army of the United States* since the 6th day of April 1917, has distinguished, or who shall hereafter distinguish, himself or herself by extraordinary heroism in connection with military operations against an armed enemy." (Emphasis supplied.)[4]

In my opinion, petitioner has served not only honorably, but with extraordinary heroism, in the military forces of the United States during the war with Japan and thus is fully qualified for citizenship under the provisions of Section 701 of the Nationality Act of 1940. No formal ceremony of enlistment or induction could legally add to his qualifications for citizenship. Petitioner is therefore admitted.

---

[3] The authority of the Secretary of War appears to derive from an order of the President under date of July 26, 1941, which reads as follows:

Military Order

Organized military Forces of the Government of the Commonwealth of the Philippines called into Service of the Armed Forces of the United States

Under and by virtue of the authority vested in me by the Constitution of the United States, by section 2(a) (12) of the Philippine Independence Act of March 24, 1934, 48 Stat. 457 [48 U.S. C.A. § 1232(a) (12)], and by the corresponding provision of the Ordinance appended to the Constitution of the Commonwealth of the Philippines, and as Commander-in-Chief of the Army and Navy of the United States, I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and place under the command of a General Officer, United States Army, to be designated by the Secretary of War from time to time, all the organized military forces of the Government of the Commonwealth of the Philippines: Provided that all naval components thereof shall be placed under the command of the Commandant of the Sixteenth Naval District, United States Navy.

This order shall take effect with relation to all units and personnel of the organized military forces of the government of the Commonwealth of the Philippines, from and after the dates and hours, respectively, indicated in orders to be issued from time to time by the General Officer, United States Army, designated by the Secretary of War.

Franklin D. Roosevelt

The White House—July 26, 1941

(F.R.Doc. 41—5548; Filed, July 31, 1941; 9:27 A.M.)

6 F.R. No. 149, p. 382 (Aug. 1, 1941.)

[4] By 10 U.S.C.A. § 1410, the President may delegate the power to award the cross to the commanding general of a separate army.