The UNITED STATES of America ex rel. Terrence STONE

v.

William B. ROBINSON, Warden of the Allegheny County Jail, Charles S. Greenhill, Sergeant in charge of the Pittsburgh Office of the United States Air Force Military Police, Robert C. Seamans, Jr., Secretary of the Air Force of the United States and Melvin Laird, Secretary of Defense of the United States.

Civ. A. 69–1138.

United States District Court, W. D. Pennsylvania.

Jan. 23, 1970.

As Amended Jan. 30, 1970.

H. David Rothman and Harold Gold, Pittsburgh, Pa., for plaintiff.

Richard L. Thornburg, U. S. Atty., Pittsburgh, Pa., Major Claude Teagarten, U. S. Air Force, Washington, D. C., for defendants.

OPINION

ROSENBERG, District Judge.

This matter is here on petition of Terrence Stone for a writ of habeas corpus to procure his release from the custody of the United States Air Force. Named as respondents in the petition are the Warden of the Allegheny County Jail, where he is presently incarcerated; a Sergeant in charge of the Pittsburgh Office of the United States Air Force Military Police, and the Secretaries of

**1262**

the Air Force and the Department of Defense.

The petitioner here complains that his position with the Armed Services lacks contractual validity and he is being retained or restrained against his will by compelled custody in the Armed Services. He argues that certain extensions of his service in the Air Force were neither consented to by him nor validated by the administering to him of oaths as required by law.

It is conceded by the parties that the petitioner of his own volition left Japan on September 12, 1969, and returned to the United States and to his home in Ellwood City, Pennsylvania, and was there arrested by the Military Police on a warrant and committed to the Allegheny County Jail. The petition for a writ of habeas corpus was thereafter filed, whereupon I ordered his retention in the Allegheny County Jail until after a hearing could be made on the merits of the case.

The intervening circumstances here seem to have produced certain questions of fact which must here be determined. The petitioner was convicted by a Japanese Judicial Tribunal of charges of robbery and attempted rape. The appellate procedure was exhausted and the ultimate appeals tribunal in Japan affirmed the decision and sentence as it was imposed by the trial tribunal. The judgment of the tribunal was a finding of guilty on both charges and the imposition of a sentence of six years at hard labor.

While I recite the circumstances of the criminal processing of the prisoner in Japan by its Judicial Tribunal, I do so because the petitioner's counsel argues that the Japanese trial procedure was not valid and that I am not bound thereby. Accordingly he argues that the Government of Japan has no right to the custody of the petitioner and the Government of the United States has no right to his custody and, therefore, the petitioner is entitled to a habeas corpus writ as of now.

After hearings were held and based upon the testimony, exhibits and records introduced into evidence I find: that the petitioner enlisted in the Air Force on September 17, 1964, for a period of four years, which would have ended on September 17, 1968; that in July of 1966 he was ordered to report to the Vietnam combat arena for a period of nine months; that during his combat tour of duty, the petitioner received several citations for valor and was permitted to travel to Japan for a period of rest and recuperation (R & R) from March 5, 1968 through March 12, 1968; that at the expiration of this period of R & R the petitioner failed to return to the Air Force and was declared to be absent without leave; that after being absent for several days, he returned to the military on March 29, 1968; that while on R & R petitioner Stone was in the company of another member of the Air Force, one Peter Batinic; that on March 27, 1968, he went to the Hotel New Otani and waited in the lobby for about one hour; that a woman came into the lobby and went over to the elevator; that the petitioner followed her and boarded the same elevator car; that the woman pushed the button for the seventh floor; that the elevator stopped at the seventh floor and he left with her following her to her room; that she opened the door to her room and the petitioner asked her where Room 750 was located, and she responded by pointing in the direction and stating "that way"; that when she turned to enter her room, Stone forced her into the room and told her that he needed money; that he removed his raincoat, and an open knife which was in the pocket fell onto the floor; that the petitioner picked up the knife and laid it on the table by the window; that he informed the woman that he was not going to hurt her but that he just needed money; that thereupon she went to her purse and took out 20,000 yen and handed it to Stone; that he then told her that he would have to tie her up; that thereupon he went to his raincoat and removed two green ropes

from a pocket; that he tied the woman's hands in front of her, but afterwards decided to tie them behind her, and placed her on the bed; that during this activity a shoulder strap on her dress broke; that Stone then put on his raincoat, picked up the knife and put it back into his pocket; that he then sat the woman on the edge of the bed and tied her feet together with a scarf; that when the telephone started to ring, he left the room; that he then returned to the lobby and eventually to the Yamato Hotel where his companion Peter Batinic waited for him; that at that time he turned over 10,000 yen to Batinic and told him how he had obtained the money; that on April 26, 1968, the Japanese Government filed a formal request with the United States military authorities that the petitioner Stone be retained in custody for the purpose of trial as the same related to the charges made by the Japanese woman; that commencing with June 26, 1968, a series of trials began in the Tokyo District Court, 9th Criminal Division, at which time Stone pleaded guilty to the robbery charge of 20,000 yen, but not guilty to the charge of attempted rape; that the Japanese Tribunal received evidence from the woman and from Stone's companion, Peter Batinic, to the effect that he had received 10,000 yen from Stone and that Stone told him how he got it from the woman; that the woman testified that in the course of his tying her up, her clothes had become disarrayed; that Stone thereupon commenced what seemed to be a sexual attack; that when the telephone rang he abandoned the attack and left; that the Tokyo District Court found him guilty of both charges and sentenced him to six years in prison at hard labor; that thereafter a series of proceedings continued until eventually on August 29, 1969, the appellate tribu-

nal affirmed the Tokyo District Court; that throughout these proceedings the Armed Services furnished Stone with counsel [1] for his defense and provided a military observer at all of the proceedings; that the case was delayed because of the fact that the law of Japan permits settlements in such cases and afforded Stone the requested time on more than one occasion to attempt a settlement; that such attempts were unsuccessful; that the military observer found the proceedings fair and that the petitioner had been accorded the due process of law as provided by the Government of Japan; that the petitioner's term of service in the interim was extended on September 17, 1968 to November 17, 1968, from November 17, 1968 to May 17, 1968 and from then on to August 17, 1969, and finally until January 26, 1970, for the purpose of enabling the military authorities to furnish legal and protective aid to the petitioner while undergoing criminal prosecution; and, that such legal and protective aid was accepted willingly by the petitioner.

The petitioner contends initially that he was coerced into the extensions of his military service and that they were forced upon him in Japan. He testified that he was told that if he did not extend his service, the Military would be required to turn him over to the Government of Japan. He testified further that the United States Government was obligated not to turn him over to Japan at the expiration of his term of service, but to return him to the United States for discharge.

There is no testimony by the petitioner that he protested the contended coercive extensions of service imposed upon him. Nor is there any testimony on his part that he did not desire the aid of counsel and the protective aid of the military observer for the purpose of af-

---

1. 10 U.S.C. § 1037(a) "Under regulations to be prescribed by him, the Secretary concerned may employ counsel, and pay counsel fees, court costs, bail and other expenses incident to the representation, before the judicial tribunals and administrative agencies of any foreign nation, of persons subject to the Uniform Code of Military Justice. So far as practicable, these regulations shall be uniform for all armed forces."

fording him due process and adequate defense to the charges against him by the Government of Japan. He says nothing of what seems obvious—that he wanted the Government's protective aid and counsel. He does not deny that he could not have gotten these unless he continued to be classified as a member of the Armed Service.

The petitioner relies here on United States ex rel. Norris v. Norman, 296 F. Supp. 1270 (N.D.Ill.1969), where a petition for a writ of habeas corpus was granted to the plaintiff Norris for his release from the custody of the Navy on the basis that his enlistment was invalid as lacking a voluntary oath because it had been obtained by duress. There the petitioner had previously been a member of the Air Force and was issued a hardship discharge. Subsequently Norris visited both the Army and Navy recruiters in Annapolis, Maryland with the intent of re-entering the military service for the purpose of making it a career. He was assured that he could enlist as a Petty Officer third class and possibly might qualify for the higher Petty Officer second class rating. When he presented himself for enlistment, he was tendered the contract for signature of enlistment and oath. Norris refused to sign because the contract did not indicate his rating as a Petty Officer second class. For reasons which were unexplained a United States Army officer erroneously confirmed that Norris subscribed to the oath and had already been issued a naval uniform, although he repeatedly protested that he had not taken the enlistment oath and would not do so until the rating was changed to Petty Officer second class. Several months later when the enlistment contract arrived he was told to sign the oath of enlistment and he refused to do so, again stating that until his real rating had been corrected he would not do so. He made appropriate protests to the legal officer who advised him nothing could be done about it. When subsequently he was again called to headquarters to sign the enlistment oath, he was told that unless he signed he would be prosecuted for various offenses, including fraudulent enlistment and unauthorized wearing of the uniform. Norris signed while protesting that he did not do so voluntarily and was doing so only because of the court martial threats.

The factual circumstances in *Norris* are not at all related to the instant case, except only insofar as they relate to the required oath of enlistment. In *Norris*, it was held that the original enlistment was not voluntary and therefore void. There is no doubt in our case that Stone's original enlistment was entirely valid and proper and continued to be so until September 17, 1968.

■ It is provided in 10 U.S.C. § 502 that each person enlisting in an armed force shall take a specific oath. Enlistment means the original enlistment or re-enlistment. 10 U.S.C. § 501. In the present case we are concerned, not with an enlistment or a re-enlistment, but rather with an extension of an enlistment. Section 509 of Title 10 U.S.C. provides in part that "Under such regulations as the Secretary concerned may prescribe, the term of enlistment of a member of an armed force may be extended or re-extended with his written consent for any period." Section 509 provides, only, that the *term of enlistment* may be extended or re-extended *with his written consent* for any period, while § 502 requires "a specific oath".

The petitioner contends, however, that because under AFM35–16(13–1), Chapter 13, Special Instructions (Extensions of Enlistments), approved requests are to be executed by the "airman" and sworn to by a person authorized to administer oaths, and that the extensions signed by the applicant were invalid because no oath was administered to him on these. While this proviso requires an oath, in the face of the statute itself which does not require an oath but only that it be in writing, this becomes unimportant in view of the fact that it was the petitioner himself who sought the protective shelter of the Armed Forces

against the charges levelled against him by the Government of Japan. Otherwise, as we shall see, the Armed Forces would have been required to turn over his custody to the Government of Japan, as of such time when its own right to his custody and sheltering protective obligations ceased.

In the case of *Norris,* supra, there was never an enlistment contract between him and the Armed Forces, while in the present case there definitely was an enlistment contract entered into on a particular date which was to have expired on a particular date, had not the petitioner become entangled in criminal offenses before the expiration date by charges of the Government of Japan.

I consider the serious predicament in which the petitioner found himself and for his eager desire to get help from the one source where he knew he could get it, that is, the Armed Forces. I therefore give no credibility to the petitioner in his statements that he was coerced into the signing of these extensions for his original term of enlistment. Factually these extensions were not extensions at all, but devices by which the petitioner was enabled to stay in Japan and out of jail in the custody of the Armed Forces by virtue of the provisions of International Agreements between the United States and the Government of Japan.

The Treaty between the United States and the Government of Japan referred to as the "Treaty of Mutual Co-operation and Security" with Japan,

TIAS 4509 signed January 19, 1960, and which entered into force June 23, 1960, provides in Article VI for a separate agreement to cover the status of United States forces in Japan. Pursuant to this authority, the Executive Department entered into an "Agreement under Article VI of the Treaty of Mutual Cooperation And Security" TIAS 4510, January 19, 1960, hereafter referred to as the Status of Forces Agreement (SOFA), which provides, inter alia:

"Article XVII

5(c) The custody of an accused member of the United States armed forces or the civilian component over whom Japan is to exercise jurisdiction shall, if he is in the hands of the United States, remain with the United States until he is charged by Japan."

The Agreed Minute concerning Paragraph 5, Article XVII states:

"In case the Japanese authorities have arrested an offender who is a member of the United States armed forces, the civilian component, or a dependent subject to the military law of the United States with respect to a case over which Japan has the primary right to exercise jurisdiction, the Japanese authorities will, unless they deem that there is adequate cause and necessity to retain such offender, release him to the custody of the United States military authorities provided that he shall, on request, be made available to the Japanese authorities, if such be the condition of his release * * * "

Under the provisions of this SOFA, if there had been no extensions granted, the Armed Forces would have been required to surrender the custody of the petitioner as of the time he was charged with robbery and attempted rape. Thus, it cannot be denied that the extensions, which the petitioner claims here were invalid, gave the petitioner the benefits of protection and aid of counsel, which he could not have gotten otherwise. It is obvious, also, that when on August 29, 1969, the final appellate tribunal in Japan affirmed the Tokyo High Court, which on April 14, 1969, had already affirmed the Tokyo District Court, the petitioner was well aware that the benefits so bestowed had come to an end, whereupon on September 12, 1969, he departed without leave for the United States. The petitioner could not have accepted these benefits without also accepting the responsibility or duty to see that the obligations of the United States Government as they concerned

him were as well respected under all the circumstances.

Article XVI of the SOFA provides as follows:

"It is the duty of members of the United States armed forces, the civilian component, and their dependents to respect the law of Japan and to abstain from any activity inconsistent with the spirit of this Agreement, and, in particular from any political activity in Japan."

Article XIV relates to members of civilian components and their dependents who are assigned to national duty in Japan. The SOFA further relates to the various matters with which individuals may be affected while in contact with Japan, including tax relationships, labor relationships and other required compliances with the law of Japan. It provides for the cooperation of both countries with each other in bringing about coordinated activities. It further provides for the right to exercise jurisdiction where it may be done concurrently. But as relates to certain offenses, SOFA provides under Article XVII, subparagraph 3(b) that "In the case of any other offense the authorities of Japan shall have the primary right to exercise jurisdiction." It would seem that the charges of robbery or attempted rape upon a citizen or subject of Japan, would give the right to claim jurisdiction to the Government of Japan.

The SOFA provides in Article XVII, subparagraph 5(a):

"The military authorities of the United States and authorities of Japan shall assist each other in the arrest of members of the United States armed forces, the civilian component, or their dependents in the territory of Japan and in handing them over to the authority which is to exercise jurisdiction in accordance with the above provisions."

In the same Agreed Minute to paragraph 9 of the same Article is provided:

"The rights enumerated in items (a) through (e) of this paragraph are guaranteed to all persons on trial in Japanese courts by the provisions of the Japanese Constitution. In addition to these rights, a member of the United States armed forces, the civilian component or a dependent who is prosecuted under the jurisdiction of Japan shall have such other rights as are guaranteed under the laws of Japan to all persons on trial in Japanese courts. Such additional rights include the following which are guaranteed under the Japanese Constitution:

(a) He shall not be arrested or detained without being at once informed of the charge against him or without the immediate privilege of counsel; nor shall he be detained without adequate cause; and upon demand of any person such cause must be immediately shown in open court in his presence and the presence of his counsel;

(b) He shall enjoy the right to a public trial by an impartial tribunal;

(c) He shall not be compelled to testify against himself;

(d) He shall be permitted full opportunity to examine all witnesses;

(e) No cruel punishments shall be imposed upon him."

"2. The United States authorities shall have the right upon request to have access at any time to members of the United States armed forces, the civilian component, or their dependents who are confined or detained under Japanese authority.

3. Nothing in the provisions of paragraph 9(g) concerning the presence of a representative of the United States Government at the trial of a member of the United States armed forces, the civilian component or a dependent prosecuted under the jurisdiction of Japan, shall be so construed as to prejudice the provisions of the Japanese Constitution with respect to public trials."

Thus, we see binding commitments between both the Government of the Unit-

ed States and the Government of Japan, by which in the case of a member of the Armed Forces being charged with the commission of a crime, the Government is bound to turn such person over to the Government of Japan. We see also that upon indictment the Government of the United States must turn over the person so charged to Japan, but that custody of such a person may be delegated to the United States.

While the petitioner in his brief makes certain contentions there is considerable disparity between these arguments in the brief and of his own testimony at the habeas corpus hearing. The petitioner refutes his prior confession and plea of guilty before the courts of Japan because he says the confession was coerced by threat of the Armed Forces; that the evidence of attempted rape as charged by the Government of Japan does not establish guilt beyond a reasonable doubt; that the record before the Courts of Japan does not reveal to what extent the sentence of six years is for attempted rape and what is for armed robbery, and therefore the conviction and sentence are tainted; that full faith and credit need not be given to the Courts of Japan; that the facts as presented in Japan would not sustain a conviction if presented in our federal courts; and that there is no requirement here to accord comity to the Japanese judgments.

I do not deem any of these contentions to be meritorious in the face of the petitioner's own testimony. The petitioner testified before me and told in detail how he had followed the Japanese woman from the hotel lobby into the elevator and through her door and into her room and even to his binding of her after she had turned the money over to him. I have given this as a factual finding here, according the petitioner's own testimony the benefit of any existing doubts as against the record of the courts of Japan, but I cannot give any credibility to the petitioner's statement that an "open" knife fell out of his overcoat pocket, or that he did not commit the crime of robbery when he came prepared with ropes to bind his victim. From his testimony as a whole, I find, not that he was coerced into procuring the extensions but that he sought these for the purpose of protective aid from his Government in a foreign land. I find, further, that he was not coerced into making any confessions of guilt before the courts of Japan on the threat of being turned over to that Government, but that he realized that he would be turned over to its courts, if his relationship with the Armed Forces expired, and that this realization is reflected in the fact that when his own Government's protection could no longer avail him, after the final appellate determination by the courts of Japan, he precipitously boarded a plane and left.

I cannot disregard the fact that the tribunals in Japan, under the watchful eye of the military observer as this petitioner was being tried with counsel furnished him at the expenses of the Government, did give credence to the woman victim's testimony and to the testimony of the petitioner's companion Batinic to the effect that the woman was robbed and that, as she testified, was forced into her room. The testimony between the woman at the trial in Japan and the petitioner at the hearing here differs in that the woman testified that as he pushed her into the room, she noticed that he had a knife with the blade open in his right hand and that she offered no resistance because of fear of the knife, whereas the petitioner at this hearing said that the open knife fell out of his coat pocket; and further it differs in that the woman said that the only part of her body that he touched other than her mouth was her breast, through her dress, and she did not know whether he touched her sex organ, but that he was frightened after the telephone began to ring, while the petitioner said he wanted only her money.

I need not make any determinations on the truthfulness of the petitioner's own disclosure of the circumstances for which he stands convicted in Japan, in

view of the fact that he has admitted before me that he forceably entered her room and robbed her of 20,000 yen. It is not for me to justify or derogate the findings of the Japanese tribunal. What is before me only is the question of whether the custody of this petitioner is being wrongfully claimed by the Armed Forces.

We may well conclude here that the petitioner had knowledge of the fact that the SOFA existed between the two Governments, and that it did involve an obligation as it related to him by the Armed Forces and certain rights as related to the Government of Japan. In any event no attack was made by petitioner's counsel in this regard, but only as to the argument that the Armed Forces should have disregarded the rights of Japan and returned him for discharge to the United States at the expiration of his enlistment.

Assuming the petitioner's argument as a fact that he would be entitled to be released in the United States at the end of his term of enlistment, I cannot, as he does, disregard his tie-in with the Japanese authorities, which occurred within his four year term of enlistment, when he was charged with the crime of robbery and attempted rape. He does not argue that the Government of Japan could have taken him into custody as of the date of the indictment and that the Government of Japan was not obligated to permit his custody to remain with the Armed Forces from that time forward until final disposition was made of the criminal proceedings against him.

Therefore, I conclude that his choice of custody with the Armed Forces as against commitment to a jail in Japan was a voluntary act willingly done for his own benefit. If he had not accepted this choice of custody with the Armed Forces, he would have permitted himself to be incarcerated in jail. If that had occurred, there would have been no extensions of his four-year enlistment and possibly no legal aid by the Armed Forces, although it is difficult to believe

that the Government would have abandoned him in any case.

The fact remains that his presence in Japan was not as the result of any extensions of his enlistment which he may have signed, but rather of his own involvement resulting in the charges which compelled him to stay in Japan and be subject to the law of Japan. That he signed his extensions while in the voluntary custody of the Armed Service was more a concern of the petitioner to have counsel and the protective influence of the United States Government, while and during the time he was being tried rather than a coercion on the part of the Armed Forces.

■ There is no evidence that he had any duties to perform as a member of the Armed Forces in Japan. His area of duty was in Vietnam and there was no evidence of his transfer from there to any other place or line of duty. It is obvious that the Armed Forces routinely had his signature on the extensions only as a basis for classifying him as a member of the Armed Forces, entitled to counsel and government aid during the trial period in the courts of Japan. The evidence as presented here does not persuade me of any compulsion on the part of the United States Government for him to extend his time in the Armed Forces during such time as he was charged with the crime in Japan.

■ Since the United States Government had an obligation to retain custody of the petitioner pursuant to the SOFA with the Government of Japan, and the petitioner had an obligation to make himself available when wanted by the Government of Japan, neither the Government of the United States could breach its obligation to Japan, nor could the petitioner after the appellate proceedings became final, suddenly leave the jurisdiction of Japan. When he did leave the jurisdiction of Japan, it was incumbent upon the United States Government to arrest and seize him, wherever it could find him, and return him. I therefore conclude and hold that the

arrest by the Armed Forces of the petitioner as of the time when he was arrested was a valid arrest and that the Government of the United States is entitled to his custody for the purpose of returning him to the jurisdiction where it was bound to hold him in custody.[2]

There is no doubt that this petitioner has found himself in a precarious position and one may readily sympathize with him as an individual who, after enlistment, served his country well in a most disagreeable line of duty and that it was an incidental misfortune of war that brought him to the position where he committed the robbery, and which he might not otherwise have committed under ordinary circumstances. But while he deserves sympathy, justice must also be respected particularly when one is charged with the serious crime of burglary.

Stone came voluntarily to Japan. He voluntarily accepted the hospitality and benefits of that Government, and he may not now or here disavow the responsibility placed upon him, while in that country, of complying with its law as regarded his own conduct towards the citizens of Japan and the liability for such penalty as was imposed by that country's law for any breach thereof by him. He had an obligation to the Government of Japan and he cannot here disclaim it, anymore than can the Government of the United States repudiate its treaty obligations.

Also, we must recognize that while Federal courts must hesitate to interfere with the functioning of the Military or in the State processes of the United States Government and the various other nations with whom it must relate in international affairs, it is the function, nevertheless, of Federal courts to recognize and respect where and when the judicial process can or cannot interfere with the administrative or executive functions.

I hold, however, that it is incumbent upon Federal courts to examine the legal custody of members of the Armed Forces under exceptional circumstances in order to preserve the constitutional rights of such individuals. This is particularly true in a case such as this where a local member of the Air Force is being sought for removal to a far distant land such as Japan.

Since the facts of this case do not warrant an interference with the functions and obligations of the executive branch of the Government, the petition for a writ of habeas corpus will be denied.

---

2. The United States Attorney's office turned over to me a telegram received by that office on January 21, 1970, at 9:00 A.M., relative to Terrence C. Stone, Airman 1st Class, which telegram I ordered filed, and which contained a short resume regarding T. C. Stone, and the fact that a habeas corpus proceedings was being processed here, and also a reference to a communication calling on the United States Government to honor its obligation in accordance with Paragraph 5(a), Article XVII of Treaty TIAS 4510. The telegram makes reference to the fact that "the sentence became final and conclusive as of September 6, 1969, as a result of the judgment of the Supreme Court on August 29, 1969, to dismiss the reappeal. On September 11, 1969, he escaped from Tachikawa Air Base (FAC 3012), where he was under military custody and took flight to the United States mainland by a civil aircraft (PAA 2) from Tokyo International Airport during the night of the same day." It further states "On September 19, 1969, the Japenes High Prosecurors Office, Tokyo, requested the US Military Authorities concerned to hand the above T. C. Stone over to the Japanese Authorities in accordance with the referenced provisions, and the US Military Authorities assured the Japanese side of their utmost efforts to that effect, while the delivery thus requested has not yet been realised up to this date." This telegraph was signed by Fumihiko Togo, Japanese Representative, Japan-US Joint Committee. (actual spelling)*

* While reference is made to the word "Treaty" in line 8 of the footnote, which is the reference to the word "Treaty" in the telegram, I note that the correct reference is evidently to "Paragraph 5(a), Article XVII of the SOFA" rather than to "Paragraph 5(A), Article XVII of Treaty TIAS 4510" as stated.