**UNITED STATES of America ex rel. Vernon Leon NORRIS, Petitioner,**

**v.**

**Captain R. J. NORMAN, Commanding Officer, Naval Administrative Command, Great Lakes Naval Training Center, Great Lakes, Illinois; John Chafee, Secretary of Navy; Melvin Laird, Secretary of Defense; Great Lakes Naval Training Center, Great Lakes, Illinois; Department of the Navy, Washington, D. C., Respondents.**

**No. 69 C 91.**

United States District Court
N. D. Illinois, E. D.

March 12, 1969.

Bernard J. Nussbaum, Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., for petitioner.

Thomas A. Foran, U. S. Atty., Eugene Robinson, Asst. U. S. Atty., Chicago, Ill., Peter F. Vaira, Asst. Atty. Gen., Department of Justice, Washington, D. C., for respondents.

MEMORANDUM OPINION

PARSONS, District Judge.

Vernon Leon Norris, claiming indigency and appearing *pro se,* filed his petition in this Court for issuance of a writ of habeas corpus ordering the appropriate United States Navy authorities to release him from their custody. In due course, respondents, by the United States Attorney, filed a return. The issue is whether petitioner is a member of the United States Navy. The return to the petition questioned neither the sufficiency of the petition nor the jurisdiction of the Court.

On February 20, 1969, after a review of some undisputed documents and inquiry into petitioner's financial status, the Court appointed civilian counsel to represent petitioner here.

At a further hearing on the same date, respondents stated that there was no issue as to the sufficiency of the petition or the jurisdiction of the Court and acknowledged that petitioner had exhausted whatever administrative remedies may have existed for determination of his claim.

Accordingly, the Court held that it had jurisdiction of the cause and ordered that any military proceeding with relation to the trial of the petitioner for allegedly being improperly absent from the United States Navy be held in abeyance *pendente lite.* The Court also recommended that petitioner be transferred to a non-disciplinary barracks. Finally, the Court set a plenary evidentiary hearing for March 3, 1969.

On that date, petitioner and respondents each announced their readiness to proceed. The Court received testimonial and documentary evidence on March 3, 4 and 5. With the cooperation of counsel, the witnesses and of the various Naval personnel assisting the respondents' counsel the Court was able to continue with its hearings until well into the evenings so as to expedite resolution of the matter.[1]

Before summarizing the Court's conclusions of law and fact, preliminary comment is appropriate. The Court wishes to compliment the Navy personnel involved in this proceeding. Each conducted himself with the directness and courtesy typifying that great service. They have done the Navy proud and deserve its commendation. Secondly, the Court fully recognizes that the case before it is unusual and wishes to emphasize that the following discussion must be read in light of that unique factual situation.

I.

As already noted, respondents expressly conceded the jurisdiction of the Court prior to the evidentiary hearing. Nonetheless, in their motion for judgment at the close of petitioner's case, they urged that the Court did not have jurisdiction because petitioner had not exhausted his administrative remedies.[2] Despite respondents' earlier concession that any administrative remedies had been exhausted, the Court has

1. Both petitioner and respondents had a legitimate desire for expedition here. On February 24, 1969, Charles A. Bowsher, Assistant Secretary of the Navy, wrote to petitioner as follows: "I can assure you * * * that the Navy will abide by any final decision made by the District Court. I trust this matter will be resolved expeditiously." Moreover, habeas corpus petitions are entitled to preferential hearing. 28 U.S.C. § 2242.

2. The motion was denied and respondents thereupon presented their evidence.

examined the respondents' later contrary contention and finds it to be without merit.

In the first place, respondents have failed to inform the Court what if any adequate administrative remedy exists for a purported enlistee to question his military status *vel non.* The evidence in the instant case indicates that the petitioner repeatedly sought to question his military status within the military framework and was repeatedly advised that nothing could be done. The uncontradicted evidence is that high-ranking personnel attempted to set administrative machinery in motion to determine whether petitioner should be separated from the service, but were advised that a court order was required for separation. This information was relayed to the petitioner by the military authorities. It was only after receiving such advice, and after his attempts at varying levels of command to obtain administrative determination of his claim, that petitioner resorted to this Court as advised by his military counsel.

Under such circumstances, it would be manifestly unfair once again to relegate petitioner to a perhaps non-existent administrative machinery to determine his claim, particularly since the claim itself denies all military jurisdiction over him. Moreover, at no time prior to or during the hearings did respondents suggest that this case be held in abeyance pending administrative consideration of petitioner's claims, or give any assurance to the Court that any such determination could be speedily had.

Indeed, it may be inferred from statements made by respondents' counsel as well as from the already referred to statements made to petitioner, that the Navy itself desired the matter to be handled by either a military or civilian court rather than administratively.

It was of course possible for petitioner to test the question of whether he was in the military service by interposing an appropriate motion in the court martial proceeding that had been instituted against him for an unauthorized absence. However, one who denies all military authority over him need not submit to the military criminal judicial system to test that claim before contending in a civilian court that he is a civilian. This is true particularly when, as here, the initial determination in such a court martial would be made by a court composed of military officers who are neither lawyers nor judges. A court martial is neither a prerequisite nor a bar to petitioner's invoking the habeas corpus jurisdiction of this Court. Hammond v. Lenfest, 2d Cir., 398 F.2d 705, 714.

Likewise, although not raised by respondents, the Court has *sua sponte* considered whether *habeas corpus* is an applicable procedure, testing in that consideration whether petitioner is in sufficient "custody" to authorize resort to the writ even though he is not in prison. 28 U.S.C. § 2241.

At the time he brought the petition, Norris was under restraint both because the Navy was asserting jurisdiction and physical control over him allegedly against his will and because in the exercise thereof the Navy had placed him in a special category of a disciplinary nature. This was absolved only as a result of the already mentioned Court recommendation to transfer him to non-disciplinary barracks.

We conclude that a petitioner who challenges the legality of his membership in the armed services by writ of habeas corpus, though he is performing duty and service customarily performed under such membership, is "in custody" within the terms of 28 U.S.C. § 2241.

Section 2241, creating in the federal courts of the United States the power and authority to issue and determine writs of habeas corpus and to enforce the same, specifically includes among others any person asserting himself to be a prisoner under, or by color of, the authority of the United States itself. The history of the writ indicates that it constitutes a prompt avenue of

redress for grievances second to none. Restrictions upon its availability must be narrowly construed, must be clear and unequivocal, and not imposed by judicial gloss. "Any other view would make the ends to be served by the great writ wooden." Hammond v. Lenfest, *supra*, at 711.

As early as 1875, it had been held that the validity of both an enlistment and a conscription into the military service may be tested on application for a writ of habeas corpus to a federal judge, Scheider [Schmeider] v. Barney, C.C.N.Y., Fed.Cas.No.12,416 [12,462] (1875); Stingle's Case, D.C.Pa., Fed. Cas.No.13,458 (1863). The law is now well settled that where the legality of detention by a military service is challenged by a petition for a writ of habeas corpus, the United States Federal Courts have jurisdiction to hear and determine the issue. In re Tarble, 80 U.S. 397, 20 L.Ed. 597 (1872); Hammond v. Lenfest, *supra*; De Coster v. Madigan, 223 F.2d 906 (7th Cir. 1955); Petition of Phillips, 167 F.Supp. 139 (S.D.Cal.1958).

This Court has jurisdiction of the subject matter of this action. An application for writ of habeas corpus was the proper manner for the petitioner herein to test whether the United States Navy's assertion of authority over him was lawful.

II.

We turn now to the merits of his application. Petitioner is 30 years old and received an elementary school education. He has two brothers and five sisters. While still in grade school, he worked on a part-time basis for a gasoline station and his earnings went to support his family. When he left school, he worked at the same gasoline station on a full-time basis for several years. Again, most of his earnings went to support his family. He also worked in the construction industry.

Eventually, he enlisted in the United States Air Force continuing to contribute to his family's support. While in the United States Air Force, petitioner's mother, who had been ill, became more seriously disabled and he was issued a hardship discharge. His service in the Air Force was entirely honorable. He did not lose a single day due to unauthorized absence and there was no disciplinary action of any kind involving the petitioner during that period of his military service.

Upon his honorable discharge from the Air Force, Norris returned to the family home in Severn, Maryland, and worked in the construction industry, again supporting his family with his earnings. When his mother ultimately died, he left home and continued to work in the construction industry in other areas. While Norris was so engaged, his father became seriously ill and died while petitioner was returning home.

Soon after his father's death, Norris visited both Army and Navy recruiters in Annapolis, Maryland, with the intent to re-enter the military service for the purpose of making it a career.

The Government's own records reveal that petitioner had no police record and that his employers considered him a totally reliable employee of the highest caliber.

In short, prior to his alleged entry into the Navy, there is nothing derogatory in petitioner's background. To the contrary, he appears to have been a good citizen and worker who made the best of difficult circumstances. This feeling was apparently shared by the desire of the United States Navy to recruit him as a Petty Officer.

Petitioner's first contact with the Navy appears to have been in July, 1967, when he discussed possible enlistment in the Navy with a recruiter in Annapolis, Maryland. In the course of that discussion, the recruiter sought to impress on Norris the advantage of enlisting in the Navy under programs which would assure him a Petty Officer rating and assignment to the Seabees, the Navy construction force. Petitioner was initially told that he could assuredly enlist as a

Petty Officer third class and that very possibly he might qualify for the higher Petty Officer second class rate.

Petitioner was taken to a Washington, D. C., location for further Navy evaluation and testing. There he was found to be fully qualified for a second class Petty Officer rate.

On August 7, 1967, petitioner presented himself at the appropriate enlistment station in Baltimore, Maryland, believing that he would then be enlisted as a Petty Officer second class.[3]

An enlistment contract was tendered to him. The purpose of the enlistment contract is that it "is the basic document which establishes a legal relationship between the Government and an enlisted member." Bureau of Naval Personnel Manual, Part B, Chapter 2, B–2310, (1)a. The enlistment contract "must be completed whenever an individual enlists or re-enlists" *Id.* at par. (2)a. "The member must sign the Enlistment Contract in the presence of the officer administering the oath of allegiance." *Id.*

When he was tendered the contract for signature of the enlistment oath on August 7, 1967, Norris refused to sign stating that he would not do so until the enlistment contract indicated that his rank would be that of Petty Officer second class, rather than Petty Officer third class, as was then shown on the form. Norris took neither an oral nor a written oath of enlistment as prescribed by the referred to enlistment procedures as well as by statute. 10 U.S.C. § 502.

Nonetheless, for reasons that were unexplained, a United States Army officer incorrectly confirmed that Norris had subscribed to the oath and that it "as filled in, was read to the applicant prior to subscribing thereto." By subsequent document, however, the Department of the Navy stated that in fact, the oath had not been subscribed. Accordingly, the attestation was improper and is evidence neither of the taking of an oral or written oath.[4] No presumption of regularity of official acts govern here.

The short of it is that because he did not take the oath of enlistment, either orally or in writing, Norris did not enlist in the United States Navy on August 7, 1967. By the same token, the Navy could have sent Norris home for his refusal to take the oath since it was not bound either. For, as Mr. Justice Brandeis stated, "It is the actual enlistment, the oath of allegiance, that changes the status from a civilian to soldier." United States v. Union Pacific Ry. Co., 249 U.S. 354, 359, 39 S.Ct. 294, 296, 63 L.Ed. 643; 6 C.J.S. Army and Navy § 21(2) at p. 392.

However, instead of sending Norris home, the Baltimore recruiting facility directed him to proceed to Washington, D. C., for further processing. He remained in the capital for approximately two weeks, during which period he again refused to take the enlistment oath. Norris, who by this time had been issued a Naval uniform, had repeatedly complained that he had not taken the enlistment oath and would not do so until his rank was changed to Petty Officer second class. He was told that an appropriate correction certificate would be issued with regard to his rank and was directed to proceed to Port Hueneme, California. There he was to be assigned

3. Although Norris' enlistment was to be in the United States Navy, the enlistment process in Baltimore was handled by Army personnel, including civilian employees.

4. There was some testimony that perhaps Norris was already in the Navy before he was even given the opportunity to take the oath of enlistment on the basis that he had earlier put his signature on a worksheet of the enlistment contract (DD Form 4 WS). However, the only purpose of the worksheet is to provide a guide for the preparation of the final contract and to assist in determination of whether the prospective enlistee "is eligible". In any event, Norris never took the mandatory oath of enlistment in connection with the worksheet any more than he did with the enlistment contract itself.

to a Seabee component in connection with the program under which he desired to enlist.

Upon his arrival at Port Hueneme, and repeatedly thereafter, Norris asked whether his enlistment contract with the correction certificate had arrived. For several weeks he received negative responses.

Ultimately, sometime in October, 1967, Norris was called into his company office and told that the enlistment contract had arrived and that he would now have to sign the oath of enlistment. Norris examined the contract and found that no correction certificate had been issued so that his rank was still shown as Petty Officer third class. He refused to sign the contract stating that he would not do so until his rate had been corrected. He went to the appropriate legal officer who advised him that there was nothing that could be done since there was a direct order from Washington, D. C., for Norris to sign the contract in its present form. Norris was again called to the unit headquarters and again directed to sign the contract. Upon his refusal, he was told that he would be prosecuted for a variety of offenses in a court martial, including fraudulent enlistment and unauthorized wearing of the uniform, unless he signed.

At this point, Norris signed the contract, stating as he did so that his act was not voluntary, but was being done only because of the threats of court martial. It should be noted that the oath was not subscribed before an officer and that for unknown reasons, the authorities at Port Hueneme chose not to show the required confirmation of enlistment, leaving in tact the signature of the United States Army officer who had incorrectly confirmed that the oath had been subscribed to on August 7, 1967. *Cf.* 10 U.S.C. § 502; D D Form 4 Block 59.

During the trial, respondents' counsel expressly maintained that the signature of the contract in Port Hueneme was not a relevant fact. Nonetheless, the Court has examined the evidence surrounding that signature. The signature was coerced. Norris has never voluntarily taken the required oath of enlistment.

There remains for consideration the question of whether, despite his consistent refusal to voluntarily take the critical enlistment oath, Norris can be said somehow to have "ratified" the contract, or as it is sometimes put, to have constructively enlisted in the Navy. In that connection, the Court observes that it would seem that it is neither to the Navy's interest nor to the interest of its personnel to have them foisted upon each other under such a guise. A status thus created would seem to be of little benefit to either party to the enlistment contract which by definition should be knowingly and voluntarily entered into by both sides. Perhaps because of this, there was an ambivalence on the part of counsel for respondents regarding whether they contended that the enlistment contract had somehow been ratified.

As to that contention, respondents point out that Norris followed orders, did work, accepted pay for it, ate the Navy's food, etc. However, the alternative to such conduct would have been an intolerable existence and probably a court martial.

Under the circumstances, the Court holds that the performance of duties and the acceptance of pay cannot be held to have constituted a voluntary constructive enlistment or ratification by Norris. Rather his conduct represented a recognition that he had no real choice other than to succumb to the Navy authorities until the matter was ultimately resolved and to keep up his efforts in the hope of that resolution. This he did both before and after the duressed signing of the enlistment oath.

Neither United States v. Rodriguez, 2 USCMA 101, 6 CMR 101 (Ct.Mil.App.), nor Petition of Agustin, N.D.Cal., 62 F. Supp. 832, cited by respondents are to

the contrary. Neither involved a situation where, as here, an alleged enlistee had not voluntarily signed or otherwise taken an enlistment oath and continually protested his alleged status as a member of the armed forces while performing duties and accepting pay under conditions when he had no real alternative. *Cf.* In re Herman, 56 F.Supp. 733 (N.D. Tex.); United States v. King, 11 USCMA 19, 28 CMR 243 (Ct.Mil.App.) both of which recognize that the doctrine of ratification or constructive enlistment is to be limited to situations where the individual has clearly voluntarily submitted himself to a change in status from civilian to military. See also, United States v. Hall, 17 USCMA 88, 37 CMR 352 (Ct.Mil.App.) Here, Norris did precisely the opposite. He continually announced that he did not recognize that he had enlisted in the Navy, although he was willing to do so, presumably *nunc pro tunc,* if his enlistment contract form were corrected.

Unfortunately, however, Norris' protestations went unheeded and eventually he determined that the only manner in which he could effectively deny that he had voluntarily enlisted was to absent himself from the Navy. Accordingly, he departed Port Hueneme without permission in December, 1967. It must be remembered that this conduct was by an individual with a hitherto unblemished record.

The only explanation offered by respondents' counsel for this act was an unlikely argument that Norris sought to avoid shipment to Midway Island because it may be a bad liberty port.

Norris, however, testified that he believed that once he was sent to Midway, any further chance he might have of administratively straightening out his status would disappear. At that stage, after having been consistently rebuffed in his attempts either to have his rate changed or to be separated from the service, Norris believed that only by absenting himself could the matter be resolved. He did not believe his absence was unauthorized, since he was challenging that the Navy had any authority over him whatsoever. In the light of his prior exemplary life, the nature of the program for which he had wanted to volunteer, and the severity of the penalty risked, the Court cannot accept the explanation that Norris' absence was motivated because of a desire to avoid a supposedly bad liberty port.

During his absence petitioner continued his efforts to call his problem to the attention of the authorities and apparently wrote several letters in this connection.

On October 11, 1968, Norris surrendered himself in Indianapolis, Indiana. After being held in a civilian jail for several days, he was transferred to the Naval Training Center in Great Lakes, Illinois, under military guard. He is there now awaiting trial by court martial for absence without leave.[5]

To help him defend, Norris was assigned Navy counsel in the person of Lieutenant Ray Wexler, who proceeded to familiarize himself with the matter. Norris immediately related to him the problems regarding his attempted enlistment, and also wrote further letters to authorities in Washington, D. C. On the basis of his interviews, Lieutenant Wexler discussed the matter with his superior, Commander Edward K. Sanders. That officer thereupon conducted his own investigation concluding that Norris should be administratively released from any claim of Navy jurisdiction. However, Commander Sanders' recommendation was rejected by the Navy's Bureau of Personnel in Washington. He was told that a court order would be required and that the Navy either would

5. The director of the legal department of the command to which Norris was assigned recommended that no disciplinary action should be taken against Norris because of the doubt existing as to whether Norris had ever acquired military status. Nonetheless, for reasons not explained, court martial charges were instituted against Norris.

or could not handle the matter administratively.

Lieutenant Wexler so advised Norris and told him that he could either defend the court martial on the basis that no military jurisdiction existed or apply to the Court for an appropriate writ. Lieutenant Wexler recommended the latter largely because in the military court the issue would be decided by laymen. He attempted to assist Norris in obtaining civilian counsel, and Norris himself made vigorous efforts to obtain such representation. These efforts, however, were unsuccessful until this Court appointed counsel.

III.

Norris is not a member of the United States Navy having never voluntarily enlisted, constructively or otherwise. Therefore judgment will be entered for petitioner and respondent commander of the Great Lakes Naval Training Center is directed to take all steps necessary to separate petitioner from the Navy without any prejudice to him and to provide him with transportation and allowances to Severn, Maryland, with pay to the date of separation except for the period of his absence without deduction for expenses relating to his detention in, or transportation from, Indianapolis.[6]

ORDER AND WRIT OF HABEAS CORPUS

Having heard the evidence and the arguments of counsel and in accordance with the Memorandum Opinion of the Court filed herein today,

It is ordered, adjudged and decreed that respondent, Captain R. J. Norman, Commanding Officer of the Naval Administrative Command, Great Lakes Naval Training Center, Great Lakes, Illinois, and his superiors and subordinates, and all persons acting in concert with them or any of them, forthwith release Vernon Leon Norris from the custody of the United States Navy without prejudice to him, and that in connection with said release Vernon Leon Norris be separated with transportation and allowances to Severn, Maryland, with pay as a Petty Officer Third Class to the separation date, except for the period December 21, 1967, through October 10, 1968, and without deduction for expenses in relation to his transportation to the Great Lakes Naval Training Center from Indianapolis, Indiana.

It is further ordered that the restraining order entered herein on February 20, 1969, be made permanent.

It is further ordered that respondents' counsel of record advise the Court and counsel for petitioner of compliance with this order in open court not later than March 19, 1969, at 10:00 A.M., and the matter is set for receipt of such report then without further notice.

6. Petitioner stated in open Court that he would waive all damage claims against respondents and the Government if they will not claim a refund of pay received by him from the Navy.