John TALMAGE, Plaintiff-Petitioner,

v.

Robert FROEHLKE, in his capacity as Secretary of the Army, and the Sheriff of Mecklenburg County, Defendants-Respondents.

Civ. No. C–C–72–122.

United States District Court,
W. D. North Carolina,
Charlotte Division.

July 11, 1972.

James E. Keenan, Durham, N. C., Paul, Keenan & Rowan, Durham, N. C., for plaintiff-petitioner.

Hugh J. Beard, Jr., Asst. U. S. Atty., Charlotte, N. C., for defendants-respondents.

## FINDINGS AND CONCLUSIONS IN SUPPORT OF ORDER OF HABEAS CORPUS

McMILLAN, District Judge.

In this action, filed June 8, 1972, plaintiff-petitioner (hereafter "Talmage") sought writs of habeas corpus and mandamus compelling defendants-respondents to release him from their custody. Specifically, Talmage contended in his verified petition that he was being held in custody charged as a deserter from the United States Army, see 10 U.S.C. § 886, unlawfully, it being alleged that Talmage had neither enlisted nor been inducted into the Army. At the specific request of the United States Attorney, this matter was advanced on the docket and an evidentiary hearing

was conducted on June 12, 1972. At the close of the hearing, the court entered an order granting Talmage a writ of habeas corpus and directing defendants to discharge Talmage from their custody.

Pursuant to Rule 52(a), Federal Rules of Civil Procedure, and in support of that order, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

At the evidentiary hearing conducted on June 12, 1972, Talmage testified in his own .behalf and was examined and cross-examined at length. The court specifically finds from the observation of the demeanor and conduct of Talmage as a witness that he is straightforward and credible and entitled to belief as to those facts to which he testified. Specifically, the court finds that:

1. Talmage is a registrant of Local Board No. 54 in Henrico County, Virginia. He registered with the local board on January 31, 1967, shortly after the 18th anniversary of his birth.

2. Subsequent to registration, Talmage was initially granted student deferments while a student in high school and at Saint Andrews College in Laurinburg, North Carolina. Upon leaving school, Talmage was placed in Class I–A (available for induction). On or about January 13, 1971, Talmage was notified that he had been placed in the "extended priority selection group." 32 C.F.R. § 1631.6(c) (1).

3. Pursuant to an order the local board, Talmage reported for his armed forces pre-induction physical examination on February 19, 1971. As a result of this physical examination he was found fit for military duty.

4. On April 8, 1971, the local board ordered Talmage to report for induction on April 28, 1971. He reported for induction but was not inducted because the personnel at the Armed Forces Examining and Entrance Station (AFEES) at Richmond, Virginia, needed to secure a "moral waiver," which was required because of an arrest of Talmage for trespass some years earlier.

5. Talmage was later ordered to report and did report for induction on June 24, 1971. Again he was not offered induction, but rather was informed to return to the AFEES on June 29, 1971.

6. In accord with the orders of AFEES personnel, Talmage did report on June 29, 1971. He was given a cursory physical inspection and a psychiatric interview concerning possible involvement with "dangerous drugs" (Marijuana) and was again found fit for induction. Following a wait of several hours duration, Talmage and the other young men to be inducted were escorted to a ceremony room for the purpose of induction. Very shortly after entering the ceremony room, Talmage was removed from the room by a uniformed official of the induction center and taken to another room where he was fingerprinted. Talmage was not present in the ceremony room at the time that the young men were inducted into the United States Army; he neither submitted to induction nor was given the opportunity to submit to or refuse induction on June 29, 1971. Later the same day, Talmage was given a hotel ticket and meal tickets and told he was "in the Army." Although he protested that he had not been properly inducted, he was ordered to report back the next morning for transportation to Fort Campbell, Kentucky.

7. Talmage did not use the hotel ticket, but, instead, spent the night with a friend. The following morning Talmage went to the office of the American Civil Liberties Union in Richmond, Virginia, for advice. A telephone call to the AFEES revealed that Talmage was listed as having been inducted the preceding day and he was advised to go to Fort Campbell. In an attempt to set the

record straight, Talmage at his own expense traveled to Fort Campbell in an effort to secure his release should such a release be necessary. Talmage arrived at Fort Campbell on July 1 or 2 and was immediately placed with a military unit. At no time did Talmage participate in any military drills or activities and at no time did he consent to wear the uniform of the United States Army. On or about July 4, 1971, having been unsuccessful in his efforts to place his status as a civilian before military authorities, Talmage departed Fort Campbell and did not return.

8. Subsequent to his departure from Fort Campbell, Talmage learned that the Federal Bureau of Investigation was seeking him as a deserter. On June 8, 1972, Talmage surrendered himself to the AFEES at Charlotte, North Carolina. Talmage was transferred to agents of the FBI who in turn placed him in the custody of the Sheriff of Mecklenburg County, North Carolina. On the same date, Talmage filed the petition now before the court, and the court, on his motion, entered an order to show cause directed at defendants, specifically directing defendants to "neither remove [Talmage] from the jurisdiction of this court nor require of [Talmage] any obligations deriving from [his] alleged induction . . . unless and until further order of this court."

## CONCLUSIONS OF LAW

Upon the foregoing findings of fact, the court concludes as matters of law that:

1. The court has jurisdiction over the parties and subject matter of this controversy. Specifically, jurisdiction is conferred on this court by 28 U.S.C. §§ 1361, 2241(a), 2241(c) (1) and (c) (3). Upon the facts found, defendants have a clear legal duty to discharge Talmage from their custody. Further,

Talmage is "in custody under or by color of the authority of the United States" and is further "in custody in violation of the Constitution or laws . . . of the United States."

2. The pivotal question being one of status, either civilian or military, Talmage is not required to exhaust any administrative remedies prior to the seeking of relief from this court.

"However, one who denies all military authority over him need not submit to the military criminal judicial system to test that claim before contending in a civilian court that he is a civilian . . . . A court martial is neither a prerequisite nor a bar to petitioner's invoking the habeas corpus jurisdiction of this Court." United States ex rel. Norris v. Norman, 296 F.Supp. 1270, 1272 (N.D.Ill.1969).

Accord: Grant v. Cooksey, 4 SSLR 3094 (D.N.J.1971); Bradley v. Laird, 449 F. 2d 898 (10th Cir. 1971).

3. Talmage, having neither accepted induction nor been given the opportunity to accept induction, remained at all times in the status of a civilian. See Billings v. Truesdell, 321 U.S. 542, 559, 64 S.Ct. 737, 88 L.Ed. 917 (1944); Sanford v. Callan, 148 F.2d 376 (5th Cir. 1945). See also, Chernekoff v. United States, 219 F.2d 721, 724–725 (9th Cir. 1955).

4. Talmage, being a civilian, is not subject to the jurisdiction of the military authorities. United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S. Ct. 1, 100 L.Ed. 8 (1955); Billings v. Truesdell, *supra*.

5. Talmage is entitled to writs of habeas corpus and mandamus ordering defendants to discharge him from their custody.

A separate order discharging Talmage from custody has been entered.