Kevin S. ADKINS, Petitioner,

v.

The UNITED STATES NAVY and Captain J. E. Simpson, II, Commander, Nas., Corpus Christi, Respondents.

Civ. A. No. C-81-3.

United States District Court,
S. D. Texas,
Corpus Christi Division.

Feb. 13, 1981.

R. Charles Johnson, San Anselmo, Cal., c/o LTJG Gutierrez, Legal Services Office, NAS Corpus Christi, Tex., for petitioner.

Robert A. Darden, Asst. U. S. Atty., Houston, Tex., Commander Harold E. Grant, NAS Corpus Christi, Tex., for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAZEN, District Judge.

Petitioner, Kevin S. Adkins, a member of the United States Navy, is currently facing court-martial on charges of unauthorized absence. On January 12, 1981, the Petitioner filed this action seeking immediate release from the Navy on the grounds that it has violated its own regulations by retaining him in the military and processing him for court-martial. Federal jurisdiction is predicated under the general habeas corpus statute. *See* 28 U.S.C. § 2241(a) (1976). A hearing was held on the Petitioner's Motion for a Temporary Restraining Order on January 16, 1981. At that hearing, the Navy agreed to suspend imposition of any court-martial sentence pending an ultimate ruling by the Court. At the same hearing, the Navy was ordered to show cause why the writ should not be issued. *Id.* § 2243. A full evidentiary hearing was duly held on January 29, 1981. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court now enters the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

### Findings of Fact

1. The Petitioner decided to enlist in the United States Navy sometime in the summer of 1978. In preparation for entering the service, he had at least two conversations with his recruiter, Chief Petty Officer

Larry Northcutt. During the course of these conversations, Petitioner told Northcutt that he had previously been arrested for possession of marijuana but had not been convicted. The necessary forms were completed. (Plaintiff's Exhibits 8 and 9). As completed, the forms were truthful. At least three seemingly important parts of the form were left blank, however. (See Part IV, Plaintiff's Exhibit 9). These parts were certifications that the applicant had not abused narcotics, dangerous drugs, nor marijuana within certain time periods. Although Mr. Northcutt expressed the opinion that completion of these parts was not required for some reason, the applicable regulations indicate the contrary. (See ¶ 2–II–8e(1), Plaintiff's Exhibit 12). Nevertheless, the evidence at trial only tended to establish that Petitioner had used marijuana and amphetamines sometime in the past. Accordingly, he would have been eligible for enlistment, probably even without a waiver. (See ¶ 2–II–8d, Plaintiff's Exhibit 12). Before Petitioner Adkins was accepted into the service, his application went through at least three tiers of scrutiny.

2. Petitioner was under the age of eighteen years old at the time of his enlistment. His mother duly signed all necessary documents and he took the oath of allegiance freely and voluntarily. *See generally* 10 U.S.C. § 505 (1976).

3. Petitioner originally enlisted in the Navy in July, 1978, under the delayed entry plan. He did not begin active duty until September, 1978. At that time, he went through boot camp as well as special training. He was, however, dropped from a course on submarine warfare for lack of motivation. After failing to finish the course, he was assigned to the Naval Air Station in New Orleans, Louisiana. While in New Orleans, he was assigned to perform various jobs, which included being a hot-dog stand attendant and being assigned to swab floors.

4. Sometime in May, 1979, the Petitioner left base without permission. He was charged with an unauthorized absence and assessed non-judicial punishment at "Captain's Mast".

5. Sometime in June, 1979, the Petitioner again left base without permission. He was again charged with an unauthorized absence and again assessed non-judicial punishment in accordance with Navy regulations.

6. Sometime in October, 1979, Petitioner once again left the base without permission. He was again charged with an unauthorized absence and assessed non-judicial punishment in accordance with Navy regulations.

7. Sometime after returning from his last unauthorized absence, the Petitioner sought legal advice. Thereafter, the legal services officer, a non-attorney ensign, called Lieutenant Commander Gifford, Petitioner's officer-in-charge, and told him that Adkins was seeking information on the various ways to obtain a discharge.

8. During this same general time period, Adkins contacted Lieutenant Commander Gifford and informed him of his alleged homosexual preferences. Lieutenant Commander Gifford then referred the Petitioner to Lieutenant Solis, the base doctor. The Petitioner apparently told Dr. Solis that he had engaged in homosexual relations with non-military personnel while he was in the military.

9. After his consultation with the Petitioner, Dr. Solis reported to Lieutenant Commander Gifford by telephone that he believed that the Petitioner was truthfully professing a homosexual preference. Dr. Solis recommended Class II homosexual treatment. *See generally* SECNAVIST 1900.9C(5)(b)(2)(a). He further recommended administrative separation from the military.

10. In late October, 1979, after his meeting with Dr. Solis, Petitioner again left base without permission. Upon his return he was again assessed administrative punishment and sentenced to thirty days correctional custody in a Navy facility in Pensacola, Florida.

11. On November 3, 1979, before the Petitioner was to leave for Pensacola, Florida, he spoke with Dr. Mohammed, a Navy

psychiatrist. Dr. Mohammed then issued a written report. (Plaintiff's Exhibit 4). In this report, Dr. Mohammed related that the Petitioner expressed a strong desire to leave the Navy and that he was in a state of defiance and rebelling to get out. The report further stated that the Petitioner appeared to be manipulative and that he sometimes lies to get away from pressures. The report continued that the Petitioner claimed to have a preference for members of the same sex and that he appeared to verbalize his homosexual wishes around his Navy peers to stir problems and provoke rejection. The doctor's report concluded with a provisional diagnosis of homosexual and depressive tendencies.

12. On the basis of Dr. Mohammed's report, Lieutenant Commander Gifford decided that Adkins should be processed for discharge, but on grounds of unsuitability rather than homosexuality. Gifford's superior, Commander George Dresser, knew nothing about this tentative decision.

13. Lieutenant Commander Gifford did not intend to process Kevin for a *homosexual* discharge. He believed that it was his obligation to make a thorough investigation into the allegations of homosexuality. He considered the report of Dr. Mohammed and the oral report of Lieutenant Solis, as well as the ensign's oral report on Adkins' interest in being discharged. He also spoke with other unspecified Navy personnel. He then formed the opinion that Adkins was not a homosexual but instead was trying to get out of the military by any means possible. Commander Dresser apparently formed the same opinion but testified that he had never intended to approve any kind of discharge for Adkins.

14. Lt. Commander Gifford instructed the Base Personnel Office to begin processing Adkins for an unsuitability discharge while Adkins was in correctional custody in Pensacola. Shortly thereafter, he received notice of a message from Navy headquarters on the subject of correctional custody. While not introduced into evidence, the gist of the message was to state a policy that such custody was designed to be used for

rehabilitation and not as a basis for discharge. Accordingly, Gifford decided to suspend processing until Adkins was released from custody in order to determine if the custody had provided the desired therapeutic effect.

15. Adkins returned from correctional custody on approximately December 2, 1979. At that time, Commander Dresser met with Adkins and told him that he had the potential to make a good sailor and would be kept in the service. Adkins indicated that he had no desire to stay in the military.

16. Sometime in December, 1979, Adkins once again left base without permission. He returned in late November or early December, 1980.

17. Upon his return, Adkins was arrested and held for court-martial at the Naval Air Station in Corpus Christi, Texas.

18. In December, 1980, Adkins filed a request for an immediate discharge presumably based on his alleged homosexual preferences. This request was denied by the commander of the base in Corpus Christi on December 9, 1980.

19. Adkins subsequently filed an Article 138 grievance against his base commander. *See* 10 U.S.C. § 938 (1976). This complaint has apparently not been acted upon and thus appears to be pending.

20. At all times during his tenure in the military, Adkins received military pay, food, clothing and took military orders. At no time prior to the filing of this suit did Adkins ever claim to anyone in the Navy that his enlistment was procured through recruiter misconduct.

*Conclusions of Law*

This petition for habeas corpus is essentially based upon two theories. First, that Petitioner's enlistment was void *ab initio* because it was procured by fraudulent and unlawful means in that his application contained false or inaccurate information about his drug use history. Second, that the Navy violated a mandatory duty to process Petitioner for honorable discharge as a ho-

mosexual and but for this violation, Petitioner would have been separated long before his last unauthorized absence. Under either theory, Petitioner concludes that he is not subject to the pending court-martial and that this Court should order him discharged from the Navy.

■■■ The law is well-settled that the habeas corpus jurisdiction of the federal courts extends to the claim that a person is being unlawfully detained by the military. *Parisi v. Davidson*, 405 U.S. 34, 39, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972); *Apple v. Greer*, 554 F.2d 105, 107 (3d Cir. 1977); *Meck v. Commanding Officer*, 452 F.2d 758, 760 (3d Cir. 1971); *Laxer v. Cushman*, 300 F.Supp. 920, 923 (D.Mass.1969); *United States ex rel. Norris v. Norman*, 296 F.Supp. 1270, 1272 (N.D.Ill.1969). As a general rule, however, habeas corpus petitions from military prisoners should not be entertained by federal civilian courts until all available remedies within the military court system have been invoked in vain. *Noyd v. Bond*, 395 U.S. 683, 693, 89 S.Ct. 1876, 1882, 23 L.Ed.2d 631 (1969); *Gusik v. Schilder*, 340 U.S. 128, 131, 71 S.Ct. 149, 151, 95 L.Ed. 146 (1950); *Apple v. Greer*, 554 F.2d at 110. Particularly illustrative in this regard is the case of *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), in which the petitioner challenged military jurisdiction on the ground that his alleged offense was not service-related. The Supreme Court held that "when a serviceman charged with crimes by military authorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise." *Id.* at 758, 95 S.Ct. at 1313. There is also, however, authority for the proposition that where the habeas petitioner is a civilian who challenges the jurisdiction of military authorities to exercise control over him or try him in the military courts, or where he claims that he is not lawfully in the military, exhaustion is not required. *Schlesinger v. Councilman*, 420 U.S. at 758–59, 95 S.Ct. at 1313; *Noyd v. Bond*, 395 U.S. at 696 n.8, 89 S.Ct. at 1884 n.8; *Bradley v. Laird*, 449 F.2d 898, 901 (10th Cir. 1971); *Barkley v. Warner*, 409 F.Supp. 1303, 1305 (E.D.Mich.1976); *Talmage v. Froehlke*, 345 F.Supp. 1361, 1363 (W.D.N.C.1972); *contra, Hodges v. Brown*, 500 F.Supp. 25 (E.D.Pa.1980). In the present case, the Petitioner is alleging that the recruiter's misconduct resulted in an enlistment which is void *ab initio*. As such, he is claiming that he never acquired a military status and is attempting to deny all military jurisdiction over him. Accordingly, this Court holds that it has jurisdiction to decide the "void enlistment" contention on its merits.

■ Petitioner's theory is based upon the decision of *United States v. Russo*, 1 M.J. 134 (C.M.A.1975), where the court found an enlistment to be totally void. In *Russo*, it was stipulated that the recruiter furnished test answers to a person suffering from dyslexia and who could not read, in order to enable him to pass a qualification test. In the instant case, the Court has found no such recruiter misconduct. At worst, the recruiter processed and the Navy accepted a patently incomplete application. Thus, this Court considers more applicable the case of *United States v. McGowan*, 5 M.J. 860 (N.C. M.R.1978) (per curiam). In the *McGowan* case, the appellant was convicted of two specifications of unauthorized absence. The facts of the case revealed no recruiter misconduct but did reveal that while at boot camp the appellant disclosed information which would show that he did not meet the requirements for entry into the Navy because of recent use of narcotics and LSD. The Navy Court of Military Review agreed with the military judge that the enlistment contract was voidable by the government and not void. Therefore, the appellant could not prevail with a *Russo* defense at his court-martial. In the present case, even assuming that the recruiter told the Petitioner to lie about past drug use, which Adkins claims, the pertinent omissions on the enlistment application are clearly apparent. The government should thus have had clear warning of the Petitioner's potential disqualification, if any, from military service. Yet, no waiver was ever obtained.

This Court, like the Naval court in *McGowan*, concludes that the Petitioner's contract was voidable *at the option of the government*. As such, a *Russo* defense would be unavailable and the military could clearly court-martial and punish the Petitioner.

Moreover, the fact is that Congress overruled the *Russo* doctrine effective November, 1979. Article 2(b) & (c), 10 U.S.C. § 802(b) & (c) (1976 & Supp. I 1979). The legislative history clearly indicates that Congress did not believe the *Russo* doctrine served any useful purpose but instead severely undermined discipline and command authority. The committee concluded that:

> No military member who voluntarily enters the service and serves routinely for a time should be allowed to raise for the first time after committing an offense defects in his or her enlistment, totally escaping punishment for offenses as a result. That policy makes a mockery of the military justice system in the eyes of those who serve in the military services.

[1979] U.S.Code Cong. & Ad.News 1818, 1827. The new statute provides that "[t]he voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of [military] jurisdiction . . . and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment." 10 U.S.C. § 802(b) (1976 & Supp. I 1979). Furthermore, even if the party who enlisted lacks the capacity to understand the significance of enlisting, that person will still be subject to military discipline if he or she has: (1) submitted voluntarily to military authority; (2) met the mental competency and minimum age qualifications at the time of voluntary submission to military authority; (3) received military pay or allowances; and (4) performed military duties. *Id.* § 802(c). These criteria are essentially a restatement of the constructive enlistment doctrine first delineated in the case of *In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890).[1]

The Petitioner is clearly subject to military discipline. The evidence is undisputed that he voluntarily enlisted and had the capacity to understand the significance of enlisting. Furthermore, the elements of constructive enlistment have been met. He at all times submitted voluntarily to military authority. He met the mental competency and minimum age qualifications. He received military pay and allowances during his stay in the military. Finally, he clearly performed military duties. The Petitioner seeks to avoid a finding of constructive enlistment by pointing out the fact that after he returned from corrective custody in Pensacola he told Commander Dresser that he did not desire to remain in the military

---

1. The Petitioner argues that he must be allowed to raise a *Russo* defense since to hold otherwise would render the Congressional enactment an *ex post facto* law. The United States Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." U.S.Const. Art. I, § 9, cl. 3. The Supreme Court has defined an ex post facto law "as one 'that makes the action done before the passing of the law and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a crime or makes it *greater* than it was, when committed' ". *Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964); *United States v. Brown*, 555 F.2d 407, 417 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). The Supreme Court has indicated in several cases that legislation which eliminates, after the date of a criminal act, a defense available to the accused person at the time the act was committed violates the ex post facto provisions of. the United States Constitution. *See* generally *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Beazel v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925); 16A Am.Jur.2d § 645 (1979). The crucial thing to note, however, is that the prohibition against ex post facto laws is only relevant when the law is promulgated or changed after a person has committed a crime. *Burgos v. United States Board of Parole*, 360 F.Supp. 316, 319 (N.D.Ill.1973). Even assuming that Congress could not reach back and validate the initial enlistment merely on the finding of voluntariness, this particular law is not constitutionally infirm. The reason for this conclusion is that the Petitioner's constructive enlistment would be deemed to have occurred *after* the effective date of the statute. It was not until sometime thereafter that he committed the "crime" of being absent without leave. Since the abrogation of the defense would have been prior to his unlawful actions, the statute can withstand constitutional scrutiny as applied to him.

and that he previously sought a homosexual discharge and generally displayed unhappiness in the Navy. While protestations to one's superior officer could possibly avoid a constructive enlistment, the Petitioner's actions in the present case fall far short of that which is required. The case of *United States ex rel. Norris v. Norman*, 296 F.Supp. 1270 (N.D.Ill.1969), is particularly illustrative in this regard. In the *Norman* case, the petitioner presented himself at the appropriate enlistment station believing that he would be enlisted as a Petty Officer second class. When the petitioner saw that the contract called for him to be enlisted as a Petty Officer third class he refused to sign the contract. The evidence was further undisputed that he took neither an oral nor a written oath of enlistment. Nonetheless, he was issued a naval uniform and ordered to report to duty. The petitioner did report for duty, performed naval duties, accepted pay, ate the Navy's food, etc. At some point thereafter, the petitioner went absent without leave. Rather than awaiting a court-martial, the petitioner then filed a habeas corpus action. The Navy argued that the petitioner had constructively enlisted in the military. The district court rejected this argument primarily on the grounds that the petitioner continually announced that he did not recognize that the Navy had enlisted him, that he did not believe his absence was unauthorized since he was challenging that the Navy had any authority over him, and that during his absence petitioner continued his effort to call his specific problems to the attention of the authorities and apparently wrote several letters in this connection. *Id.* at 1276. In the present case, Adkins never raised the issue of recruiter misconduct until the filing of this Petition. Indeed, his main preoccupation in the Navy, when he was not absent, was to attempt to persuade his superiors that he was eligible for a homosexual discharge, which implicitly recognized that he was validly enlisted. Adkins' claim of recruiter misconduct appears to be an "afterthought". Accordingly, this Court concludes that Adkins' enlistment was not void and he is not entitled to habeas relief on this theory.

The Court now turns to the question of whether the Navy violated its own regulations in not affording the Petitioner a homosexual discharge. The Navy's policy toward homosexuals is essentially found in SECNAVINST 1900.9C, which clearly indicates that the policy of the Navy is to process for discharge any member who solicits, attempts, or engages in homosexual acts. *Id.* § 4. Separation from the service may be accomplished either through processing under the military justice system and/or by administrative action in accordance with applicable regulations. *Id.* § 5. Administrative processing is to be in accordance with the appropriate Secretary of the Navy instruction and the appropriate articles of the Bureau of Naval Personnel Manual. *Id.* § 6. Homosexuals are classified into four categories. A Class II homosexual is defined as a member who, while in the naval service, has engaged in one or more homosexual acts, or has solicited or attempted such acts though his conduct does not involve assault, coercion, force, fraud or intimidation. *Id.* § (5)(c)(2)(a). Normally, in Class II cases, disposition will be accomplished by administrative processing for separation. *Id.* § (5)(b)(c)(2)(b). A Class III homosexual is defined as a member who truthfully professes or admits homosexual preference and whose conduct does not come within the purview of Class I homosexuals or Class II homosexuals. *Id.* § (5)(c)(3)(a). A Class III homosexual *shall* be administratively processed for separation. *Id.* § (5)(c)(3)(b). Under the applicable regulations, a commanding officer (which includes an officer-in-charge) who receives information indicating that a member of his unit or organization has solicited, attempted, or engaged in a homosexual act "shall inquire thoroughly into the matter and determine all the facts and circumstances of the case." *Id.* § (5)(a). The development of information from this investigation should be directed toward disposition by one of the following courses of action: (1) dismissal of the matter if the initial information is not reasonably sup-

ported; (2) referral of charges to court-martial in appropriate cases; and (3) processing for administrative determination of separation or retention. *Id.* If the commanding officer does make a determination that the initial information is not reasonably supported, he is directed to promptly terminate all action on the case. *Id.* § (5)(b)(1). The applicable Bureau of Naval Personnel Manual states that if in the opinion of the commanding officer with a supporting opinion from a military medical authority, the member is *truthful* regarding his/her admission of homosexual preference/tendencies, administrative processing of the member is *mandatory*. BUPERS-MAN 3420184(1)(d)(1). While a finding of homosexuality and concomitant discharge are reviewable by the Secretary of the Navy under the applicable regulations, there is apparently no specific provision for review of an initial dismissal of a claim of homosexuality. *See* SECNAVINST 1900.-9C(6)(d).

■ The Fifth Circuit has held that as a general rule a court should not review internal military affairs in the absence of (a) an allegation of deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, *and* (b) exhaustion of available intra-service corrective measures. *Hodges v. Callaway*, 499 F.2d 417, 419–20 (5th Cir. 1974). The requirement of exhaustion is founded upon notions of judicial economy and, more importantly, upon a judicial respect for the principles of separation of powers under our form of government. *Laxer v. Cushman*, 300 F.Supp. 920, 924 (D.Mass.1969). A further consideration is a policy of judicial reluctance to interfere in internal military affairs. *Rank v. Gleszer*, 288 F.Supp. 174, 175 (D.Colo.1968). In the present case, the Petitioner is clearly alleging that the military has violated its own regulations. This Court is thus squarely confronted with the issue of whether the Petitioner has exhausted available intra-service remedies.

■ While the military regulations which deal with the discharge of homosexuals do not provide a mechanism for appeal of the denial of a homosexual discharge, this does not mean that normal channels of review are unavailable. For example, a member of the military may file a complaint under Article 138 of the Uniform Code of Military Justice. *See* 10 U.S.C. § 938 (1976); *Colson v. Bradley*, 477 F.2d 639, 642 (8th Cir. 1973). The statute essentially states that:

> Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with proceedings had thereon.

10 U.S.C. § 938 (1976). Where most of the material allegations in a habeas petition concern the actions of one's military commanding officer, Article 138 is the most appropriate remedy to exhaust. *Casey v. Schlesinger*, 382 F.Supp. 1218, 1220 (N.D. Okl.1974). Other courts, including the Fifth Circuit, have also endorsed the principle that a habeas petitioner should exhaust his remedies available under the Article 138 before coming to the federal courthouse door. *United States ex rel. Berry v. Commanding General*, 411 F.2d 822, 825 (5th Cir. 1969); *see generally Metz v. United States*, 304 F.Supp. 207 (W.D.Pa.1969). Finally, the law is well-settled that an administrative remedy once invoked must be followed to its conclusion. *Hayes v. Secretary of Defense*, 515 F.2d 668, 674 (D.C.Cir.1975).[2]

---

2. The Navy argues that the Petitioner must also appeal to the Board for Correction of Naval

Records in order to exhaust his administrative remedies. *See* 10 U.S.C. § 1552 (1976). There

In the case at bar, the Petitioner has filed an Article 138 complaint against his commanding officer in Corpus Christi, presumably on the grounds of his denial of a homosexual discharge. Having invoked this administrative remedy, the Petitioner must pursue it to its ultimate conclusion. The Petitioner argues, however, that the Article 138 procedure is very time-consuming and that he may well be court-martialed and sentenced before any administrative action. The simple answer to this contention is that a member of the military cannot complain that administrative action is proceeding too slowly if his own unauthorized absence contributed to and perpetrated the delay. *Barkley v. Warner*, 409 F.Supp. 1303, 1306 (E.D.Mich.1976). As stated by the court in the *Barkley* case, "[i]t is common knowledge that unraveling of military red tape is a lengthy and sometimes Herculean task." *Id.* The Petitioner first began to proclaim homosexual tendencies in late October, 1979. Upon his return from thirty days' correctional custody in early December, he learned that no discharge would be forthcoming. At that time, apparently despondent from being in the military, the Petitioner decided to exercise the self-help remedy of absenting himself without leave. The fact that the Petitioner will now likely suffer imposition of a court-martial sentence before any final administrative determination is his own fault.

Petitioner seeks support from the case of *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). There, the Supreme Court held that the district court should not stay a conscientious objector's habeas corpus proceeding until final determination of

criminal charges still pending against him in the military court system. The alleged criminal offense was failure to obey an order to board a plane for Vietnam. The *Parisi* decision, however, was expressly based on a finding that the soldier had "fully complied" with all Army Regulations dictating procedures to be followed by one seeking classification as a conscientious objector. *Id.* at 38. In the instant case, the Court has found that Adkins has not exhausted his administrative remedies. Moreover, inasmuch as *Parisi* did involve a conscientious objector, there were applicable regulations designed for the benefit of such persons and which set out a precise method of seeking discharge. In this case, the pertinent regulations are not designed to provide homosexuals with a means of requesting discharge, but rather afford the Navy a method of discharging persons believed to be unsuitable for service. While *Parisi* was decided in recognition of "the historic respect in this Nation for valid conscientious objection to military service" and one's "religious beliefs", *id.* at 45, there is no comparable ideal that homosexuals are entitled to be freed from military service upon request. *Cf. Allgood v. Kenan*, 470 F.2d 1071 (9th Cir. 1972). This Court thus rejects the contention that once Adkins professed homosexual tendencies to the doctors and they reported this to the commanding officer, that officer was required to process him for discharge immediately and, failing to do so, Adkins could absent himself without leave and then escape the normal consequences.

In summary, this Court concludes that the Petitioner's enlistment was not void and he is subject to military discipline. To that

has been considerable disagreement among the circuits as to whether the administrative review afforded by the Board of Correction of Naval Records or other similar boards established for the other branches of the armed forces is required. Several courts have held that exhaustion before the Board is not required when a discharge from the military is sought. *See generally Hayes v. Secretary of Defense*, 515 F.2d 668 (D.C.Cir.1975); *Williams v. Froehlke*, 356 F.Supp. 591 (S.D.N.Y.1973), aff'd, 490 F.2d 998 (2d Cir. 1974); *United States ex rel. Joy v. Resor*, 342 F.Supp. 70 (D.Vt.1972). The Fifth Circuit has taken a po-

sition that where neither court-martial nor military justice proceedings are pending, an applicant seeking discharge does not have to appeal to the Board for Correction of Military Records in order to exhaust his available administrative remedies. *Pitcher v. Laird*, 421 F.2d 1272, 1276 (5th Cir. 1970). Since the Petitioner has an Article 138 complaint pending and an administrative remedy once invoked should be carried to its conclusion, this Court intimates no opinion as to whether the Petitioner must appeal to the Naval Board for Correction of Military Records in order to exhaust his administrative remedies.

extent, the Petitioner's Motion for a Writ of Habeas Corpus is DENIED. The Court further concludes that it is inappropriate to short-circuit the military's internal administrative workings. The ground alleging failure to accord the Petitioner a homosexual discharge must, therefore, be DISMISSED for failure to exhaust administrative remedies. To the extent that any of the foregoing findings of fact constitute conclusions of law, they shall be deemed as such. To the extent that any of the foregoing conclusions of law are findings of fact, they are deemed as such.